# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| DYSON, INC. and DYSON TECHNOLOGY LIMITED,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>SHARKNINJA, INC.,<br>OMACHRON ALPHA INC., and<br>OMACHRON INTELLECTUAL PROPERTY INC.,<br><br>    *Defendants*. | Case No. 2:24-cv-386<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION, OR IN THE ALTERNATIVE, MOTION TO TRANSFER PLAINTIFFS' INFRINGEMENT CLAIMS UNDER 28 U.S.C. § 1404**

███████████████

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................. 1

II.    FACTUAL BACKGROUND ................................................. 3

    A.    SharkNinja, Inc. .................................................... 3

    B.    Omachron ............................................................. 7

        1.    Omachron Intellectual Property Inc. ................... 7

        2.    Omachron Alpha Inc. ......................................... 8

III.    THIS COURT LACKS PERSONAL JURISDICTION OVER ALL
DEFENDANTS ................................................................. 10

        1.    There Is No General Jurisdiction. ..................... 10

        2.    Specific Jurisdiction Is Absent ......................... 11

IV.    ALTERNATIVELY, THIS COURT SHOULD TRANSFER THE CASE. ................. 21

        1.    Legal Standard—Motions to Transfer Under 28 U.S.C. § 1404(a) .......... 22

        2.    This Action Could Have Been Brought in the District of
Massachusetts. .......................................... 23

        3.    The Private Factors Weigh Strongly in Favor of Transfer. ......... 23

        4.    The Public Factors Also Weigh in Favor of Transfer. ............ 29

V.    CONCLUSION ............................................................... 30

## STATEMENT OF THE ISSUES

1.      Does this Court have personal jurisdiction over the Defendants, each of which is a foreign

holding corporation with no operations or products and no connections to Texas?

2.      Should this case be transferred to the District of Massachusetts for convenience pursuant

to 28 U.S.C. § 1404?

███████████

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*In re Acer Am. Corp.*,
   626 F.3d 1252 (Fed. Cir. 2010), *as amended* (Jan. 13, 2011)............................................25, 27

*Adaptix, Inc. v. HTC Corp.*,
   937 F. Supp. 2d 867 (E.D. Tex. 2013)........................................................................................27

*In re Apple Inc.*,
   979 F.3d 1332 (Fed. Cir. 2020)..................................................................................................29

*Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*,
   2015 WL 123852 (E.D. Tex. Jan. 7, 2015)................................................................................26

*Avocent Huntsville Corp. v. Aten Int'l Co.*,
   552 F.3d 1324 (Fed. Cir. 2008)..................................................................................................19

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*,
   444 F.3d 1356 (Fed. Cir. 2006)..................................................................................................11

*Calder v. Jones*,
   465 U.S. 783, 790 (1984)............................................................................................................10

*Celgard, LLC v. SK Innovation Co., Ltd.*,
   792 F.3d 1373 (Fed. Cir. 2015)..................................................................................................10

*Corcoran v. CVS Health Corp.*,
   169 F. Supp. 3d 970 (N.D. Cal. 2016) .......................................................................................14

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)....................................................................................................................10

*Dalton v. R & W Marine, Inc.*,
   897 F.2d 1359 (5th Cir. 1990) ...................................................................................................16

*Farmobile LLC v. Farmers Edge Inc.*,
   2022 WL 2653893 (E.D. Tex. July 7, 2022) ................................................................27, 29, 30

*Fellowship Filtering Techs., LLC v. Alibaba.com, Inc.*,
   2016 WL 6917272 (E.D. Tex. Sept. 1, 2016)..............................................13, 15, 16, 17, 19

*In re Genentech, Inc.*,
   566 F.3d 1338 (Fed. Cir. 2009)..................................................................................................25

*Godo Kaisha IP Bridge 1 v. Xilinx, Inc.*,
   2017 WL 4076052 (E.D. Tex. Sept. 14, 2017)..........................................................................23

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)..............................................................................................................10, 11

███████████

*In re Google LLC,*
   2021 WL 4427899 (Fed. Cir. Sept. 27, 2021) ........................................................................30

*In re Google LLC,*
   2021 WL 5292267 (Fed. Cir. Nov. 15, 2021) .......................................................................23

*Hargrave v. Fibreboard Corp.,*
   710 F.2d 1154 (5th Cir. 1983) ..............................................................................................16

*Hodes v. Van's International Foods,*
   2009 WL 10673137 (C.D. Cal. July 1, 2009) .....................................................................14

*In re Hoffman-La Roche, Inc.,*
   587 F.3d 1333 (Fed. Cir. 2009) ...........................................................................................27

*In re Honeywell,*
   2024 WL 302397, at *3 (Fed. Cir. Jan. 26, 2024) ..........................................................27, 29

*In re HTC Corp.,*
   889 F.3d 1349 (Fed. Cir. 2018) ...........................................................................................23

*In re TikTok, Inc.,*
   85 F.4th 352 (5th Cir. 2023) .......................................................................22, 23, 24, 26, 29

*Int'l Shoe Co. v. Washington,*
   326 U.S. 310 (1945) ........................................................................................................10, 11

*Kleiner v. Sw. Airlines Co.,*
   2008 WL 4890590 (W.D. Tex. Nov. 4, 2008) ....................................................................28

*Lusk v. Foxmeyer Health Corp.,*
   129 F.3d 773 (5th Cir. 1997) ...............................................................................................17

*Merial Ltd. v. Cipla Ltd.,*
   681 F.3d 1283 (Fed. Cir. 2012) ...........................................................................................19

*Monkton Ins. Servs., Ltd. v. Ritter,*
   768 F.3d 429 (5th Cir. 2014) ...............................................................................................10

*Negrón-Torres v. Verizon Commc'ns, Inc.,*
   478 F.3d 19 (1st Cir. 2007) .................................................................................................16

*Neil Bros. Ltd. v. World Wide Lines, Inc.,*
   425 F. Supp. 2d 325 (E.D.N.Y. 2006) ................................................................................25

*Nespresso USA, Inc. v. Ethical Coffee Co. SA,*
   263 F. Supp. 3d 498 (D. Del. 2017) ...............................................................................17, 20

*In re Nintendo Co., Ltd.,*
   589 F.3d 1194 (Fed. Cir. 2009) ...........................................................................................23

*Oyster Optics, LLC v. Coriant Am. Inc.,*
   2017 WL 4225202 (E.D. Tex. Sept. 22, 2017) ...................................................................30

*Phonometrics, Inc. v. N. Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998) ........................................................................16

*Pinkerton Tobacco Co., L.P. v. Art Factory*,
    2021 WL 4776349 (C.D. Cal. June 18, 2019) ............................................12, 18

*Pitt v. Metropolitan Tower Life Ins. Co.*,
    2020 WL 1557429 (N.D. Cal. Apr. 1, 2020) ....................................................14

*Princeton Digital Image Corp. v. Facebook, Inc.*,
    2012 WL 3647182 (E.D. Tex. Aug. 23, 2012) ...........................................11, 12

*Quick Techs., Inc. v. Sage Grp. PLC*,
    313 F.3d 338 (5th Cir. 2002) ............................................................................16

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*,
    148 F.3d 1355 (Fed. Cir. 1998) ........................................................................19

*Rice v. First Energy Corp.*,
    339 F. Supp. 3d 523 (W.D. Pa. 2018) ..............................................................14

*In re Samsung Elecs. Co., Ltd.*,
    2 F.4th 1371 (Fed. Cir. 2021) .............................................................21, 24, 30

*Saudi v. Northrop Grumman Corp.*,
    427 F.3d 271 (4th Cir. 2005) ............................................................................20

*SharkNinja Operating LLC et al. v. Dyson, Inc. et al.*,
    No. 1:23-cv-11277 (D. Mass.) ..........................................................................13

*In re Stingray IP Sols., LLC*,
    56 F.4th 1379 (Fed. Cir. 2023) ........................................................................20

*Stingray IP Sols., LLC v. Signify N.V.*,
    2021 WL 9095764 (E.D. Tex. Oct. 25, 2021) ..................................................15

*In re TS Tech USA Corp.*,
    551 F.3d 1315 (Fed. Cir. 2008) ........................................................................25

*U.S. v. Bestfoods*,
    524 U.S. 51 (1998).............................................................................................16

*Ultravision Techs., LLC v. Holophane Eur. Ltd.*,
    2021 WL 12136658 (E.D. Tex. Jan. 26, 2021)..................................................11

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964)...........................................................................................22

*In re Volkswagen AG*,
    371 F.3d 201 (5th Cir. 2004) .....................................................................25, 26

*In re Volkswagen of Am., Inc.*,
    545 F.3d 304 (5th Cir. 2008) .....................................................................23, 30

*In re Volkswagen of Am., Inc.*,
   566 F.3d 1349 (Fed. Cir. 2009) .................................................................................. 28, 29

*Walden v. Fiore*,
   571 U.S. 277 (2014) ......................................................................................................... 13

*Wireless Consumers All., Inc. v. T-Mobile USA, Inc.*,
   2003 WL 22387598 (N.D. Cal. Oct. 14, 2003) ................................................................ 22

*Wireless Recognition Techs. LLC v. A9.com, Inc.*,
   2012 WL 506669 (E.D. Tex. Feb. 15, 2012) ........................................................ 25, 29, 30

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) ......................................................................................................... 10

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
   2012 WL 292362 (D. Del. Jan. 20, 2012) ........................................................................ 18

*Zeller v. Optavia, LLC*,
   2022 WL 17858034 (S.D. Cal. Dec. 22, 2022) ................................................................ 14

### Statutes

28 U.S.C. § 1391(c)(3) ............................................................................................................ 22, 23

### Rules

Fed. R. Civ. P. 45(c)(1)(A) ........................................................................................................ 27

Fed. R. Civ. P. 45(c)(1)(B) ........................................................................................................ 27

### Regulations

17 C.F.R. § 229.101(c) ............................................................................................................... 14

17 C.F.R. § 240.14a-3(b)(1) ......................................................................................................... 6

## I.    INTRODUCTION

In Defendants' Motion to Dismiss the Original Complaint (Dkt. No. 24), Defendants explained that this case does not stand alone.  Through their Amended Complaint, Plaintiffs Dyson, Inc. and Dyson Technology Limited underscore that explanation.  Instead of amending their allegations to address the jurisdictional and venue facts Defendants presented, Dyson repeats—verbatim—its erroneous jurisdictional allegations, choosing instead to add four patents to the case. In addition to Dyson's troubling disregard for the lack of personal jurisdiction, equally troubling is that Dyson had already asserted three of the four "new" patents in Massachusetts where those patents **remain asserted**, and asserts a fourth "new" patent that is subject to **instituted** IPR proceedings.  Dissatisfied with the status of proceedings in its first-filed case, and ignoring demonstrable invalidity questions, Dyson seeks greener pastures.  In so doing, however, Dyson concedes that this case and the first-filed Massachusetts case involve common subject matter, representing to this Court that it would be "more efficient" to litigate the claims together.  Dkt. No. 27 at 2.  Given Dyson's concession, and the indisputable fact that the Massachusetts court first possessed of the subject matter of the dispute, the Massachusetts court is the proper court to resolve this dispute, which Defendants explain in their co-pending motion to stay.

Thus, while likely unintentional, by filing the Amended Complaint, Dyson highlights the related nature of the multiple pieces of a global litigation puzzle that began in 2023.  Those pieces include patent infringement allegations exchanged between the parties in the District of Massachusetts and in the U.S. International Trade Commission, as well as invalidity challenges lodged by both parties at the USPTO and across the globe.  As made clear by Dyson in its recent filings here and in Massachusetts, Dyson first placed this puzzle piece on the board in Massachusetts.  This piece cannot fit in two places, and it does not fit here.

Beyond Dyson's disregard for its choice to first file in Massachusetts, Dyson disregards

this Court's lack of personal jurisdiction over the Defendants who do not make or sell products; the Defendants are holding companies:  SharkNinja, Inc. being the parent-holding company of the SharkNinja family of companies; Omachron Intellectual Property Inc. being an IP-holding company; and Omachron Alpha Inc. being a holding company and licensee/licensor of certain IP owned by Omachron Intellectual Property Inc.  Instead, non-parties SharkNinja Operating LLC and SharkNinja Sales Co., indirect subsidiaries of SharkNinja, Inc., make and sell the accused products.  Dyson knows these entities:  Dyson accused SharkNinja Operating and SharkNinja Sales of infringing the three Massachusetts patents, and Dyson has litigated multiple patent and other cases against SharkNinja Operating and SharkNinja Sales for a decade, but no case in Texas.

Dyson also knows the Defendants have no employees, property or connection with Texas or this District.  Rather, the persons knowledgeable about the operation and sales of the accused vacuum products work out of the headquarters for SharkNinja Operating and SharkNinja Sales outside of Boston in Needham, Massachusetts.  But SharkNinja Operating and SharkNinja Sales neither reside nor have a regular and established place of business in this District.  As Dyson's choice of defendants demonstrates (a choice made in two complaints), Dyson knows it could not sue the proper parties here.  Dyson could have and should have filed these claims in Massachusetts where it first asserted three of the patents it now seeks to add to this case, belatedly conceding that it would be more efficient to litigate these claims together.

Taking this together, Dyson knows its claims do not belong here.  Dyson's Amended Complaint purposefully muddles and ignores the very real legal and factual distinctions between those whom it chose to sue and the entities whom it should have sued.  Dyson does so without pleading alter ego or agency; it just smears a layer of fog over the picture hoping it will be enough to move forward.  It is not.  The corporate distinctions matter, and the facts matter.  None of the

Defendants has any contact with Texas or this District, places any product into the stream of commerce, or satisfies the requirements of Fed. R. Civ. P. 4(k)(2).  In short, personal jurisdiction is absent and dismissal is required, or, at the very least, transfer mandated to Massachusetts.

In addition to the three *first-filed* Dyson patents that remain pending in Massachusetts, the additional six patents Dyson also asserts here are also subject to suit in Massachusetts by way of a suit for declaratory judgment of non-infringement filed by SharkNinja Operating and SharkNinja Sales.[1]  Dyson asserts that efficiency and the avoidance of duplicative proceedings dictate that the nine patents be tried together as one overall controversy.  Because that controversy was first filed in Massachusetts, it should be tried in Massachusetts.  Dyson will have its day in court—just in the right court and against the right parties.  This Court, however, should not accept Dyson's efforts to manipulate the facts, force this latest puzzle piece into this Court's docket, and avoid the patent venue requirements—dismissal, or at a minimum, transfer to Massachusetts is mandated.

## II.    FACTUAL BACKGROUND

### A.  SharkNinja, Inc.

SharkNinja, Inc. ("SN, Inc.") is a holding company incorporated under the laws of the Cayman Islands, with its registered office located at P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.  Flynn Decl. ¶ 5.  SN, Inc.'s principal executive office address is 89 A Street, Needham, Massachusetts (a suburb of Boston), which is where SN, Inc. held its annual shareholder meeting and all but one in-person board of directors' meetings.  *Id.* ¶¶ 5, 14.

SN, Inc. came into being on May 17, 2023, for the purpose of "completing the listing of [SharkNinja, Inc.] on the New York Stock Exchange ('NYSE') and related transactions to carry

---

[1] *See SharkNinja Operating LLC et al. v. Dyson, Inc. et al.*, No. 1:24-cv-12130 (D. Mass.).  The sixth patent—subject to instituted IPR—was added after Dyson amended its complaint.

on the business of SharkNinja Global SPV, Ltd., and its subsidiaries." *Id.* ¶ 6.[2]  Through its eight-member board and four executive officers, SN, Inc. oversees the distribution, and enhancement in value, of its shares.  *Id.* ¶¶ 9, 12–13.  Under the Memorandum and Articles of Association (the "Articles"), SN, Inc.'s governing document, the "Directors may in their absolute discretion and without approval of the holders of Ordinary Shares, allot, issue, grant options over or otherwise dispose of Shares …."  *Id.* ¶ 9; *see also id.*, Ex. 4 at Art. 3.  The Articles continue by identifying the different types of shares and management of shares, e.g., transfer, redemption, forfeiture, and transmission of shares.  *See generally id.*, Ex. 4 at Art. 4, 5, 8–18.  The Articles further delineate, among other items, the requirements for and proceedings at "General Meetings" (*id.*, Ex. 4 at Art. 20–22), member voting and proxies (*id.*, Ex. 4 at Art. 23–24), and the requirements for Directors, including their fees, powers, duties, appointment, removal, and proceedings.  *Id.*, Ex. 4 at Art. 28–33.  Directors serve on three types of committees that oversee certain accounting, compensation, and corporate governance functions.  None of these committees has anything to do with product development, manufacture, marketing, or distribution.  *Id.* ¶ 9; *see also id.*, Ex. 1 at 97–99, Ex. 4 at Art. 30.  Notably, the Articles do not require participation in, management or direction of the business of any operating subsidiaries, whether direct or indirect, nor do they even mention SharkNinja Operating LLC ("SN Operating") or SharkNinja Sales Co. ("SN Sales") or their businesses.  *See id.* ¶ 9.  As explained in SN, Inc.'s Corporate Governance Guidelines, the Board "provide[s] oversight of, and strategic guidance to, the Chief Executive Officer and other senior management of the Company."  *Id.* ¶ 10; *see also id.*, Ex. 5 at § 1.  SN, Inc. does not exercise control over or participate in the daily operations of other SharkNinja entities.  *See id.* ¶¶ 9–10.

---

[2]  "Related transactions" refers to the transfer of SharkNinja Global SPV, Ltd. stock as part of the NYSE listing.  Flynn Decl. ¶ 6.

As a holding company, SN, Inc. does not develop, manufacture, sell, offer to sell or import the accused vacuum products or otherwise; that responsibility falls on its subsidiaries. *Id.* ¶ 19.[3] Because SN, Inc. does not manufacture or sell products, it has nothing to place into the stream of commerce, whether through a "DTC channel" or "retail channels," as Dyson alleges in its Amended Complaint. *See* AC ¶¶ 22–27. The SharkNinja branded products pre-date SN, Inc.'s May 2023 formation by nearly two decades. Prior to the formation of SN, Inc., and since SN, Inc.'s founding, SN Operating and SN Sales exclusively dictate and control the daily operations in the United States related to the accused vacuum products. Flynn Decl. ¶ 8.

SN, Inc. has no connection to Texas. SN, Inc. does not own, lease or rent any office space, real property, residence or place of business in Texas. *Id.* ¶ 15. SN, Inc. does not do business, has no registered agent and is not licensed to do business in Texas. *Id.* ¶¶ 16, 18. ███████████████

████████████████████████████████████████████████████████████████████████

████████████████ None of SN, Inc.'s board members or officers is based in Texas, but instead, each of SN, Inc.'s executive officers resides and works in Massachusetts. *Id.* ¶¶ 12–13. Indeed, lacking an agent for service in Texas, Dyson served the original complaint on Mr. Barrocas at his home in Massachusetts. Morgan Decl., Ex. 1 at 4.

████████████████████████████████████████████████████████████

████████████████████—SN, Inc. has no assets. *Id.* ¶ 18. SN, Inc. has no bank accounts in the United States, or elsewhere, has no taxable income, and pays no taxes in the United States, or

---

[3] The 2023 Annual Report, at F-9 (p. 133), mistakenly states "SharkNinja, Inc. … distributes products throughout North America, Europe, and other select international markets." This is a scrivener's error. "Inc." should not have been included in the sentence, as is clear from the context of the overall report and specific paragraph describing the Company as a global company that creates numerous products. Flynn Decl ¶ 20. That error has since been corrected, as reflected in SharkNinja, Inc.'s recently filed Form 6-K, dated August 8, 2024. *Id.*; *see also id.*, Ex. 6 at 14.

elsewhere.  *Id.* ¶ 17.  SN, Inc. does not derive and has never derived any income from the accused vacuum cleaner products, or other products.  *Id.* ¶¶ 19, 23.  As "a holding company [SN, Inc.] depend[s] on [its] subsidiaries to meet [its] obligations and pay any dividends." *Id.*, Ex. 1 at 49. SN, Inc. reports consolidated earnings attributable to income earned by its subsidiaries as required by the SEC.  *See* 17 C.F.R. § 240.14a-3(b)(1) ("The report shall include, for the registrant and its subsidiaries, consolidated and audited balance sheets ….").

SN, Inc. and the other SharkNinja entities, including the indirect subsidiaries of SN, Inc., adhere to corporate formalities. ███████████████████████████████████ ██████████████████████  Each entity has separate accounting records, as well as separate tax liabilities.  *Id.* ¶ 23. █████████████████████████████████████

████████████████████████████    █████████    █████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████

Because SN, Inc. is a holding company with no products or sales, it is not possible to purchase products from SN, Inc.  When a potential customer visits sharkninja.com, for example, the copyright to the page is attributed to SN Operating.  *Id.* ¶ 21.  If that customer wants to purchase a product, the customer must click on the "Shop our Brands" button, which takes the customer to a separate webpage that directs the customer to Shark-branded or Ninja-branded products.  *Id.*  If the customer selects the link for Shark products in the United States, the customer is taken to yet

another page where products are available for purchase. *Id.* That webpage also identifies SN Operating as its owner, and payment for products is made to SN Operating. *Id.*

When a potential investor visits sharkninja.com looking for investment information, the investor must click the "Investors" button at the top of the page, which takes the investor to a separate webpage that includes investor-related information. *Id.* ¶ 22. The copyright for the investor-related webpages is attributed to Q4 Inc., an investor relations platform company. *Id.* Contrary to Dyson's allegations, investor presentations are not product advertisements; the presentations contain product images but provide no information about the products, such as prices or features. *Id.* The Disclaimer at the beginning explains that the presentation reflects "the Company's current views" concerning the overall business and financial conditions. *Id.*

SN, Inc. is not involved in and has no control over the day-to-day operations of the other SharkNinja entities, including SN Operating and SN Sales. *Id.* ¶¶ 9–10. SN, Inc. does not direct or control the activities of any other SharkNinja entities; SN, Inc. is not involved in the manufacture, sale, offer for sale or importation of the accused products. *Id.* ¶¶ 9–10, 19. As Dyson is aware from other litigation, SN Operating, ███████████████████████████ ████████████ is responsible for the U.S. operations of the SharkNinja business, including manufacture, sale, and import of the accused products. *Id.* ¶ 8; *see also id.*, Ex. 3. SN Operating holds the IP license from Omachron Alpha. *Id.* ¶ 29; *id.*, Ex. 3. And SN Sales ███████████████ ████████████████████████████████ is responsible for managing retail agreements, relationships with distributors, and marketing. *Id.* ¶¶ 8, 26; *see also id.*, Ex. 3.

## B. Omachron

### 1. Omachron Intellectual Property Inc.

Omachron Intellectual Property Inc. ("Omachron IP") is a Canadian company. Omachron IP is incorporated in Canada, and its only office is located at 9 King Lane, Hampton, Ontario,

Canada L0B 1J0, which is the address where Dyson executed service of the Complaint. Evans Decl. ¶ 5; Dkt. No. 16. Omachron IP is not an operating company; it has no products and does not engage in any manufacturing, marketing, distribution, importation, or sales activities of any products or services—it is an IP holding company. Evans Decl. ¶¶ 5–6. Omachron IP licenses certain of its patents to Omachron Alpha Inc. (also a Canadian company), which in turn licenses those patents to non-party SN Operating. Millman Decl. ¶¶ 6–7.

Other than owning U.S. patents, Omachron IP has no ties to the United States, much less Texas. Omachron IP has no U.S. offices and has no employees. Evans Decl. ¶¶ 5–7. Other than its U.S.-based IP, Omachron IP has no assets or accounts in the United States. Evans Decl. ¶ 8; Millman Decl. ¶ 3. It is not licensed to conduct business and has no registered agent in Texas or the United States. Evans Decl. ¶ 6. Omachron IP has no contracts with any entities in the United States, including with any SharkNinja entity, and has not manufactured, sold, offered for sale, or imported any products anywhere in the world. *Id.* ¶¶ 5–6. Omachron IP pays no taxes in Texas or the United States. Millman Decl. ¶ 3. Omachron IP engages in no activities that contribute to the placement of products into the stream of commerce, whether directed at Texas or otherwise.

### 2.  Omachron Alpha Inc.

Like Omachron IP, Omachron Alpha Inc. ("Omachron Alpha") is incorporated in Canada, and its only office is located at 9 King Lane, Hampton, Ontario, Canada L0B 1J0, which is where Dyson executed service of the Complaint. Evans Decl. ¶ 10; Dkt. No. 15. Omachron Alpha is also an intellectual property licensing company. Evans Decl. ¶ 10. Omachron IP granted Omachron Alpha an exclusive license, with the right to sublicense, to certain patents and technology related to vacuum and other cleaning equipment. Millman Decl. ¶ 6; *see id.*, Ex. 1.

Omachron Alpha has no products and thus does not make, sell, offer to sell or import products in Texas or otherwise. Evans Decl. ¶ 11. Omachron Alpha has no offices, assets or

accounts in Texas or the United States and has no employees.  Evans Decl. ¶¶ 10–11; Millman

Decl. ¶ 4.  Omachron Alpha is not licensed to conduct business, owes no taxes and has no

registered agent in Texas or the United States.  Evans Decl. ¶¶ 10–11; Millman Decl. ¶ 4.



neither Omachron

Alpha nor Mr. Conrad have any control over SN Operating's use or non-use of the licensed patents

and technology.  Millman Decl. ¶¶ 8–10.  And although the agreement states that █████████

████████████████████████████████████████████████████████████████████████████

█████████  SN Operating is not obligated to use any specific Omachron Alpha technology or

patents, and, from Omachron Alpha's perspective, SN Operating is the sole decision-maker with

respect to the products it designs, manufactures, and sells, including how it designs the products

and where it sells the products.  *Id.*  Although Mr. Conrad regularly travels to and works with

engineers located in Massachusetts to assist with the implementation of his inventions, neither Mr.

Conrad nor any Omachron entity determines what is commercially relevant or reasonable.  *Id.*

There is not and has never been any relationship between any Omachron entity and SN,

Inc.  Evans Decl. ¶¶ 9, 14–15; Millman Decl. ¶¶ 11–13.  Dyson's assertion that a joint development

relationship exists between SharkNinja and the Omachron Defendants ignores which entities have

a relationship: Omachron Alpha licensed to SN Operating—not SN, Inc. Millman Decl. ¶ 7.

## III.  THIS COURT LACKS PERSONAL JURISDICTION OVER ALL DEFENDANTS

The requirement that a plaintiff establish the court's personal jurisdiction over a defendant "protects the defendant against the burdens of litigating in a distant or inconvenient forum" with which it has little or no contact. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Due process requires that the defendant has sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In patent cases, Federal Circuit law governs the personal jurisdiction inquiry, and the plaintiff bears the burden to prove that personal jurisdiction exists over each defendant. *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1377–78 (Fed. Cir. 2015); *see also Calder v. Jones*, 465 U.S. 783, 790 (1984).

In its Amended Complaint, Dyson alleges that the "Defendants have conducted and are conducting substantial business in the State of Texas and this District, both generally and with respect to the allegations in this Complaint." AC ¶ 21. Thus, Dyson appears to assert personal jurisdiction under both general and specific jurisdiction theories. Neither assertion is true.

### 1.  There Is No General Jurisdiction.

For general personal jurisdiction, a foreign corporation's affiliations with the state must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 138–39 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The Fifth Circuit has held that it is "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014).

***SharkNinja, Inc.*:**  No plausible basis exists for this Court to exercise general jurisdiction over SN, Inc. As Dyson admits in its Amended Complaint, SN, Inc. is a Cayman Islands

corporation, with its registered office located in the Cayman Islands.  AC ¶ 17.  Dyson offers only

a cursory, boilerplate allegation that SN, Inc. conducts substantial business in Texas such that

jurisdiction exists "generally."  But as explained, SN, Inc. does not conduct business in Texas.

SN, Inc. is a holding company, and as such, does not manufacture or sell products.  Flynn Decl. ¶

19.  SN, Inc. has no employees ███████████, bank account or registered agent in Texas,

nor does it own, lease or rent any office space or property in Texas.  *Id.* ¶¶ 11, 15–16, 18.  Dyson

pleads no facts—there are none—to support any allegation that SN, Inc. is so affiliated with Texas

as "to render [it] essentially at home [in Texas]."  *Goodyear*, 564 U.S. at 919 (quoting *Int'l Shoe*,

326 U.S. at 317); *Princeton Digital Image Corp. v. Facebook, Inc.*, 2012 WL 3647182, at *2 (E.D.

Tex. Aug. 23, 2012) (no jurisdiction over holding company "that has never done any business in

Texas, never had any offices or employees in Texas, and has never paid taxes in Texas").

**Omachron IP and Omachron Alpha**:  Both Omachron Defendants are incorporated and

headquartered in Canada, and neither has offices, employees, bank accounts, or property, or pays

taxes, in Texas or the United States generally.  Evans Decl. ¶¶ 5–8, 10–11; Millman Decl. ¶¶ 3–4.

Dyson cannot point to any "continuous and systematic" contacts with Texas as required.

### 2.  Specific Jurisdiction Is Absent.

For specific jurisdiction, the Federal Circuit employs a "three-prong test" that consists of

determining whether:  "(1) the defendant purposefully directed its activities at residents of the

forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal

jurisdiction is reasonable and fair."  *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d

1356, 1362–63 (Fed. Cir. 2006).  "Under the stream of commerce theory, the first two prongs of

the specific personal jurisdiction analysis can be established where the *defendant* delivers its

products into the stream of commerce with the expectation that they will be purchased by

consumers in the forum State."  *Ultravision Techs., LLC v. Holophane Eur. Ltd.*, 2021 WL

████████████

12136658, at *3 (E.D. Tex. Jan. 26, 2021) (internal quotations omitted) (emphasis added).

i.    **SharkNinja, Inc.**

Dyson alleges that this Court has specific jurisdiction over SN, Inc. because it "sells and/or offers to sell the accused products to consumers in the State of Texas and this District directly and through the stream of commerce by working with its wholly owned subsidiaries or agents, distributors, and/or other entities located in the State of Texas." *See, e.g.*, AC ¶¶ 22, 27. But just as SN, Inc. has no general affiliations with Texas, it has not purposefully directed activities at Texas that relate to Dyson's claims. SN, Inc. does not make, use, sell or offer for sale—directly or indirectly—the accused products, and thus does not place any products, much less the accused products, into the stream of commerce. *See* Flynn Decl. ¶ 19. "That alone ends the inquiry." *See Pinkerton Tobacco Co., L.P. v. Art Factory*, 2021 WL 4776349, at *4–6 (C.D. Cal. June 18, 2019) (dismissing a foreign affiliate that "never manufactured or placed '*any* products into the stream of commerce that might have ended up in the forum'") (emphasis in original); *Princeton*, 2012 WL 3647182, at *2 (finding that "because [defendant] is simply a holding company" there was no evidence that the defendant used the infringing technology and therefore dismissing the claims).

SN Operating and SN Sales—not SN, Inc.—are responsible for the manufacture and sale of SharkNinja-branded products in the United States, including the accused vacuum products. Dyson knows this well. Flynn Decl. ¶ 8. For the past 10 years, Dyson and SN Operating/SN Sales have challenged each other in a series of IP and other cases—none in Texas. Morgan Decl. ¶ 12. The present dispute, moreover, began when Dyson wrote to *SharkNinja Operating LLC* and *SharkNinja Sales Co.* to assert infringement of a patent owned by Dyson. Morgan Decl., Ex. 2. Although Dyson sent that letter shortly before SharkNinja, Inc. was listed on the NYSE, since sending the letter, Dyson has pursued infringement claims regarding haircare products against SN

12

Operating and SN Sales in the District of Massachusetts.  *See generally SharkNinja Operating LLC et al. v. Dyson, Inc. et al.*, No. 1:23-cv-11277 (D. Mass.).  The parties have completed fact discovery, with trial expected in early 2025.  Dyson has not sought to add SharkNinja, Inc. to that case.  Ignoring what it knows from this, and other litigation between the parties, here, Dyson attempts to blur the lines between the distinct SharkNinja entities in its effort to place this case before this Court and does so without pleading alter ego or agency.  *See, e.g.*, AC ¶¶ 20–34.  Dyson implements this blurring strategy because there is no venue over SN Operating or SN Sales in this District.  Notably, Dyson did not add any jurisdictional allegations to the Amended Complaint despite having Defendants' Motion to Dismiss the Original Complaint in hand.

The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  To impute a third party's contacts to the defendant under an agency theory, "the defendant must exercise control over the third party's activities in the forum by directing its agents or distributors to take action there," and "the parent company's control over the agent must pervade the agent's dealings with the forum." *Fellowship Filtering Techs., LLC v. Alibaba.com, Inc.*, 2016 WL 6917272, at *2 (E.D. Tex. Sept. 1, 2016) (internal quotations and citations omitted).  Likewise, "[t]o impute the contacts of a third party to the defendant under an alter ego theory, the lines between the defendant and the third party must become so blurred that the two become one." *Id.* (internal quotations omitted).  Because the corporate form "should not be lightly disregarded," "the typical corporate relationship between a parent and subsidiary, including one hundred percent stock ownership and identity of directors and officers, is not a sufficient basis to impute the contacts of a third party to the defendant under an alter ego theory." *See id.*  Dyson cannot show a disregard for the corporate form.

13

Dyson points to statements in the 2023 Annual Report describing an "omnichannel distribution strategy" using the pronoun "we." AC ¶ 22 ("[w]e sell our products …"), ¶ 25 ("we sell to [] Walmart, Amazon …"). Dyson, however, omits from these selective excerpts, the following introductory statement: "Unless the context requires otherwise, (i) references to 'SharkNinja,' the 'Company,' 'we,' 'us,' and 'our' refer to … (b) SharkNinja, Inc. and its consolidated subsidiaries…." Flynn Decl., Ex. 1 at 9. As numerous courts have found, the use of generic pronouns in annual reports is a common practice and does not establish a unity of interest that dismantles the separateness of related companies. *See, e.g.*, *Zeller v. Optavia, LLC*, 2022 WL 17858034, at *4 (S.D. Cal. Dec. 22, 2022); *Pitt v. Metropolitan Tower Life Ins. Co.*, 2020 WL 1557429, at *4–5 (N.D. Cal. Apr. 1, 2020) ("Nor is the fact that [Defendant] publicly represented itself as 'MetLife,' 'we,' or 'our' inherently suspect."); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 984 (N.D. Cal. 2016) ("that separate corporate entities present[] themselves as one online does not give rise to the level of unity of interest required to show companies are alter egos"); *Hodes v. Van's International Foods*, 2009 WL 10673137, at *2 (C.D. Cal. July 1, 2009) (finding that 10-K's reference to the parent company and its subsidiaries collectively is not evidence of the parent company's decision to market or sell the product in California); *Rice v. First Energy Corp.*, 339 F. Supp. 3d 523, 537 (W.D. Pa. 2018) (finding statements in public filings "fall way short of showing that [defendant] actually controlled the daily operations of [subsidiary]"); *see also* 17 C.F.R. § 229.101(c) (requiring that certain filings made to SEC, including annual report, include a description of the business done by the registrant and its subsidiaries). Thus, that SN, Inc. uses the pronoun "we" in its annual report and other investor-directed documents (*see, e.g.*, AC ¶¶ 22, 25, 28, 31–32, 35) does not demonstrate that SN, Inc. participates in the sale of the accused products.

This Court has held that statements in SEC filings could indicate that a foreign parent holding company "uses its multi-level corporate structure to actively participate with control and management of group activities related to at least importation, distribution and sale of accused products." *Stingray IP Sols., LLC v. Signify N.V.*, 2021 WL 9095764, at *4 (E.D. Tex. Oct. 25, 2021) (internal quotations omitted).  The facts here are different:

- The SN, Inc. board is not the "chief operating decision maker of the operating segments" of any of the SharkNinja subsidiaries (Flynn Decl. ¶¶ 9–10);

- SN, Inc. files consolidated financial statements as required by the SEC; SN, Inc. does not make any revenue, pays no taxes, and does not control the returns of its subsidiaries (*id.* ¶ 23);

- SN, Inc. does not control the daily operations of any of the subsidiaries, including SN Operating and SN Sales (*id.* ¶¶ 9–10).

In contrast to *Stingray*, there is no "distinct nexus between [SN, Inc.'s] activities as the parent company in the [SharkNinja] group and the ultimate presence of the accused products in Texas through the stream of commerce." *Stingray*, 2021 WL 9095764, at *5.  Rather, "broad, sweeping statements made in various SEC filings," without more, cannot support a finding of personal jurisdiction of SN, Inc. *Fellowship*, 2016 WL 6917272, at *4–5.

Dyson also alleges that SN, Inc. sells the accused vacuum products, including through its "DTC channel" using SharkNinja's websites and a "retail channel."  AC ¶¶ 23–26.  But, as explained above, SN Operating is responsible for the sales of products.  Flynn Decl. ¶ 8.  Dyson fails to show that SN, Inc. controls these channels.  In fact, as also explained above but omitted from Dyson's Complaint, the URL pages, including the image of the page reproduced in paragraph 23 of Dyson's Complaint, all point to SharkNinja Operating LLC.  Flynn Decl. ¶ 21.  And although Dyson pastes a "Secure Checkout" screen shot in paragraph 24, it omits that payment is made to SharkNinja Operating, LLC.  *See id.*  While the accused products are available in this District, as they are throughout the United States, that availability is not attributable to SN, Inc.

Setting aside that Dyson does not connect these websites to SN, Inc., at best, the allegations show that the SharkNinja entities use a common tradename, which is insufficient to establish personal jurisdiction. *See Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 345 (5th Cir. 2002) (finding no personal jurisdiction over foreign defendant even with use of trade name by defendant and local subsidiary); *Negrón-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 26 (1st Cir. 2007).

As to the "retail channel," Dyson does not plead any facts suggesting that SN, Inc. controls the "retail channel" sales strategy. *See* AC ¶¶ 25–26. Instead, as its name suggests, SN Sales is responsible for that aspect of the business; SN Sales is the entity that executes agreements with retailers, and, as Dyson acknowledges in the Complaint, SN Sales—not SN, Inc.—pays sales tax in Texas. AC ¶ 29; *see also* Flynn Decl. ¶¶ 8, 26. Dyson, moreover, pleads no facts that suggest SN Sales' activities should be imputed to SN, Inc., and SN Sales' indirect subsidiary relationship with SN, Inc. does not suffice. *See, e.g.*, *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998); *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990) (affirming no jurisdiction over a Delaware corporation because "the mere existence of a parent-subsidiary relationship will not support the assertion of jurisdiction over a foreign parent").

Dyson's remaining allegations (AC ¶¶ 29–33) also do not establish personal jurisdiction over SN, Inc. That SN, Inc. and SN Sales share overlapping officers is insufficient to establish personal jurisdiction. *U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.") (citations omitted); *see also Fellowship*, 2016 WL 6917272, at *4 ("[I]dentity of officers and directors, even coupled with other indicia of alter ego status, is not a sufficient basis to impute contacts of a third party to the defendant."); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983). In

*Bestfoods*, moreover, the Supreme Court explained that it is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." 524 U.S. at 69 (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997)) (alterations in original).  For example, while Mr. Barrocas wears multiple hats within SharkNinja operating entities. ████████████████████████████████████████████████████

Because SN, Inc. "does not engage in any manufacturing or sales activities" related to any products (anywhere), does not control any activities of, nor is involved in or regularly apprised of the day-to-day operations of the SharkNinja subsidiaries (Flynn Decl. ¶¶ 9–10, 19), there is no specific jurisdiction.  *See Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 503–05 (D. Del. 2017) (finding the stream-of-commerce requires plaintiff to demonstrate that the parent companies were responsible for introducing the accused products into the stream of commerce, "and not simply that a subsidiary within the United States introduced the [accused products]"); *Fellowship*, 2016 WL 6917272, at *1, *5 (finding no jurisdiction over a marketing company that existed "solely for the purpose of promoting" websites and did not operate the accused websites).

### ii.    Omachron Defendants

Focusing solely on joint development efforts between SharkNinja and Omachron (AC ¶¶ 36–40), Dyson hopes to blur the line between SharkNinja as a whole and the two Omachron Defendants.  But they are separate, unrelated and independent entities.  First, and importantly, the cited joint development efforts are ***not*** between the Omachron Defendants and *SN, Inc*.  Rather, as explained above, and as Dyson knows from the cases quoted in the Complaint, Omachron Alpha licensed to SN Operating, and, in that agreement, ████████████████████████████████ ████████████████████████████████ The agreement does not name or involve SN, Inc., nor is

SN, Inc. a party in the cases Dyson identifies in its Complaint.  *See* Millman Decl. ¶ 11.

Next, Dyson's focus on the collaboration between SN Operating and Mr. Conrad, undermines its specific jurisdiction allegations:  Dyson can only point to collaborative efforts that occurred *in Massachusetts*.  *See, e.g.*, AC ¶ 36 (explaining that Omachron engineers traveled to "SharkNinja's *Needham* headquarters to collaborate" and "frequent in-person collaboration between SharkNinja and Omachron [occurred] in *Needham*") (emphasis added), *id.* at ¶ 38 (asserting that "Mr. Conrad and engineers from Omachron hav[e] calls with SharkNinja engineers in *Boston* and even ma[ke] frequent trips to *Boston* to work with SharkNinja" engineers) (emphasis added).  Setting aside whether development activities even constitute acts of infringement,[4] Dyson has no basis to allege such activities touched Texas, and therefore such activities in Massachusetts are irrelevant to whether this Court has jurisdiction over the Omachron Defendants.

Dyson uses the collaboration to leap to an allegation that the Omachron Defendants jointly "*manufacture* the accused products" knowing they would be sold in Texas.  AC ¶ 39 (emphasis added).  That leap falls flat.  Neither Omachron Defendant has manufactured, sold, offered for sale or imported the accused products in the United States or elsewhere.  The Omachron Defendants make nothing.  Evans Decl. ¶¶ 5–6, 11.  Both merely license IP and ███████████████  █████  The Omachron Defendants do not place any product into the stream of commerce, and there is no basis for jurisdiction.  *Pinkerton*, 2021 WL 4776349, at *4–6.

As explained, Omachron Alpha granted an IP license to SN Operating.  While that agreement demonstrates that Omachron Alpha does business in Massachusetts, it is irrelevant to this Court's jurisdictional analysis.  *See, e.g.*, *Pinkerton*, 2021 WL 4776349, at *4–6.  To the extent

---

[4]  *See XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2012 WL 292362, at *3 (D. Del. Jan. 20, 2012) ("If a product is in development, but has not reached the stage where it has been made or used, there is no claim upon which relief can be granted.").

Dyson hopes to tie sales of the accused products in Texas by SN Operating and SN Sales to Omachron Alpha through the license, the Federal Circuit has rejected such an approach.  In *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed. Cir. 1998), the plaintiff argued the Minnesota court had jurisdiction over the defendant because the defendant had thirty-four licensees who sell products in Minnesota.  The court held that while the "licensees have extensive contacts with Minnesota, [] this additional factor is also insufficient to submit [the defendant] to personal jurisdiction in the state.  In simple terms, doing business with a company that does business in [a state] is not the same as doing business in [that state]."  *Id.* at 1361; *see also Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1336 (Fed. Cir. 2008) (finding the mere existence of an exclusive license does not support a finding of specific jurisdiction).

Finally, to the extent Dyson argues that through the collaboration, the activities of SN Operating should be imputed to the Omachron Defendants, that argument also fails.  Dyson alleges no facts suggesting that the Omachron Defendants exercise control over SN Operating or that the lines between the Omachron Defendants and SN Operating have become so blurred that they are one.  *Fellowship*, 2016 WL 6917272, at *2.  The Omachron Defendants do not direct or control the activities of SN Operating or any SharkNinja entity, and there is and has never been any ownership relationship between any Omachron entity and any SharkNinja entity.  Evans Decl. ¶¶ 9, 14, 15, Millman Decl. ¶¶ 12–13.  There is thus no basis for this Court to exercise personal jurisdiction over the Omachron Defendants, and the claims should be dismissed.

### b.  Rule 4(k)(2) Does Not Save Dyson's Jurisdictional Arguments.

Dyson alleges that each Defendant is also subject to this Court's jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2).  AC ¶¶ 35, 41.  The Federal Circuit has identified three elements to Rule 4(k)(2):  (1) the claim arises under federal law, (2) the defendant is not subject to personal jurisdiction in the courts of any state, and (3) due process is satisfied.  *Merial Ltd. v. Cipla Ltd.*,

681 F.3d 1283, 1294 (Fed. Cir. 2012).  Rule 4(k)(2) "does not operate to relax the [due process] requirement that the defendant's contacts with the forum be constitutionally sufficient."  *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 275 (4th Cir. 2005).  "[I]f the district court determines that [defendants] are subject to personal jurisdiction in another state, or if [defendants] designate such a forum, the district court is welcome to transfer the case as it sees fit."  *In re Stingray IP Sols., LLC*, 56 F.4th 1379, 1385 (Fed. Cir. 2023) (alterations in original).  Moreover, if "minimum contacts have not been established through either a stream of commerce or agency approach, *ipso facto*, personal jurisdiction cannot be predicated on Fed. R. Civ. P. 4(k)(2)."  *Nespresso*, 263 F. Supp. 3d 498 at 506.  Dyson cannot satisfy the last two elements of the Rule for any defendant.

***SharkNinja, Inc.*:**  SN, Inc. is subject to jurisdiction in Massachusetts (and this Court is free to transfer to Massachusetts) where it maintains its principal executive offices, holds board meetings, and has held its annual shareholder meeting.  Flynn Decl. ¶¶ 5, 14.  Dyson, thus, could have filed this suit in the District of Massachusetts, and, in fact, has sued SN, Inc. in Massachusetts for alleged infringement of the same three patents it now seeks to assert here.  Morgan Decl., Ex. 3; *see Stringray*, 56 F.4th at 1385 (The "negation requirement entails identifying a forum where the plaintiff *could have* brought suit—a forum where jurisdiction would have been proper at the time of filing, regardless of consent.") (emphasis in original).  And as explained, SN, Inc. lacks contacts that are sufficient to establish personal jurisdiction in Texas under the due process clause.  Dyson cannot establish jurisdiction pursuant to Rule 4(k)(2) against SN, Inc.

***Omachron Defendants*:**  As with SN, Inc., Dyson cannot satisfy the latter two elements of the Rule.  Based on Dyson's allegations, the Omachron Defendants are subject to personal jurisdiction in Massachusetts, and thus this Court can transfer the suit there.  *Stringray*, 56 F.4th at 1385.  Dyson could have, and has, sued the Omachron Defendants in Massachusetts; in the

Massachusetts suit involving SN, Inc., Dyson asserts that the Omachron Defendants infringe the same three patents. Morgan Decl., Ex. 3. In Massachusetts, Dyson relies on the same Massachusetts-based, joint development efforts to support its allegations of personal jurisdiction for the Omachron Defendants as it does here. *Compare id.* ¶¶ 11–12, *with* AC ¶¶ 36–40. And in that same case, the Massachusetts court denied Dyson's motion to transfer the case from Massachusetts to Illinois, finding that the "operative events in this [Massachusetts] case may, in fact, have occurred in [Massachusetts] as SharkNinja, a Massachusetts company, is allegedly the exclusive licensee of Omachron's vacuum patents and the two companies seemingly developed technology here." Morgan Decl., Ex. 4 at 4. As explained, moreover, the Omachron Defendants lack contacts that are sufficient to establish personal jurisdiction in Texas under the due process clause. Dyson cannot establish jurisdiction under Rule 4(k)(2) against the Omachron Defendants.

In sum, Dyson cannot establish personal jurisdiction over each Defendant under either a general or specific jurisdictional theory or under Rule (4)(k)(2), and the claims should be dismissed. Moreover, despite knowing the jurisdictional defects in its complaint, Dyson did not add any new jurisdictional allegations or plead any new facts when it amended its complaint. Given this, Dyson should not be allowed leave to amend its complaint *again*. *Metricolor LLC v. L'Oreal S.A.*, 791 Fed. App'x 183, 190–91 (Fed. Cir. 2019); *3G Licensing, S.A. v. Lenovo Grp. Ltd.*, 2019 WL 3974539, at *9 n.7 (D. Del. Aug. 22, 2019), *report and recommendation adopted*, 2019 WL 7635823 (D. Del. Sept. 19, 2019).

## IV.    ALTERNATIVELY, THIS COURT SHOULD TRANSFER THE CASE.

The Supreme Court and the Federal Circuit "have repeatedly assessed the propriety of venue by disregarding manipulative activities of the parties" and have "rejected parties' attempts to manipulate venue." *In re Samsung Elecs. Co., Ltd.*, 2 F.4th 1371, 1377–78 (Fed. Cir. 2021). In *Samsung*, the plaintiff constructed a patent-ownership scheme intended to manipulate venue. The

Federal Circuit rejected the plaintiff's efforts, relying, in part, on 28 U.S.C. § 1359, which states that a district court "shall not have jurisdiction of a civil action in which any party, by assignment *or otherwise*, has been improperly or collusively made or joined to invoke the jurisdiction of such court." *Id.* (emphasis added). The Federal Circuit granted *mandamus*, reiterated that a party cannot manipulate venue so as to "favor[] trial in an inconvenient forum," and ordered transfer. *Id.* at 1377–78, 1381 (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 624 (1964)).

Although Dyson has not formed a shell company for venue purposes (as in *Samsung* and other cases), its venue-inspired litigation tactics are no less manipulative: Dyson's first-filed infringement claims remain in Massachusetts. Dyson ignores the parties responsible for the alleged infringement—SN Operating and SN Sales—because 28 U.S.C. § 1400(b) precludes naming them as defendants in a patent case here. Dyson, thus, turns to foreign corporations, which can be sued in "any judicial district," knowing those entities do not participate in the manufacture or sale of the accused products. Dyson, likewise, knows that this District has no connection to this case; there are no witnesses, documents or physical evidence here. The only thing connecting this case to this Court is Dyson's decision to file here, and as the Fifth Circuit recently held, that is not enough. *See, e.g.*, *In re TikTok, Inc.*, 85 F.4th 352, 366 (5th Cir. 2023). Dyson's forum shopping and willful blindness to, and manipulation of, the facts should be rejected. *See Wireless Consumers All., Inc. v. T-Mobile USA, Inc.*, 2003 WL 22387598, at *5–6 (N.D. Cal. Oct. 14, 2003).

Thus, to the extent the Court finds there is personal jurisdiction over each Defendant (there is not), the Court should transfer to the District of Massachusetts pursuant to 28 U.S.C. § 1404(a).

### 1. Legal Standard—Motions to Transfer Under 28 U.S.C. § 1404(a)

28 U.S.C. § 1404(a) allows a district court to transfer a case to any other district where it could have been brought "[f]or the convenience of parties and witnesses" and "in the interest of justice." The Fifth Circuit balances several "public" and "private" interest factors when deciding

a § 1404(a) venue transfer question. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 314 n.9, 315 (5th Cir. 2008) ("*Volkswagen II*"). "[I]n a case featuring most witnesses and evidence closer to the transferee venue with few or no convenience factors favoring the venue chosen by the plaintiff, the trial court should grant a motion to transfer." *In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009). "[D]isposition of a [§ 1404(a)] motion should [take] a top priority in the handling of a case." *TikTok, Inc.*, 85 F.4th at 362 (alterations in original).

### 2. This Action Could Have Been Brought in the District of Massachusetts.

As explained, the District of Massachusetts has personal jurisdiction over each of the Defendants. And because Defendants are all foreign corporations, venue is proper in the District of Massachusetts. 28 U.S.C. § 1391(c)(3); *In re HTC Corp.*, 889 F.3d 1349, 1354 (Fed. Cir. 2018).

### 3. The Private Factors Weigh Strongly in Favor of Transfer.
#### a) The Sources of Proof Are Located in the District of Massachusetts.

This factor focuses on the location of physical sources of proof, such as documents and other physical evidence. The bulk of the evidence relating to the accused vacuum products is in or near Needham, Massachusetts, where SN Operating and SN Sales—the entities responsible for the development and sales of the accused vacuum products—are headquartered. *Godo Kaisha IP Bridge 1 v. Xilinx, Inc.*, 2017 WL 4076052, at *3 (E.D. Tex. Sept. 14, 2017) (finding the bulk of discovery material is at a party's corporate headquarters).

"[T]he location of document custodians and location where documents are created and maintained, which may bear on the ease of retrieval," must be considered. *In re Google LLC*, 2021 WL 5292267, at *2 (Fed. Cir. Nov. 15, 2021). Here, documents relevant to the engineering and development, marketing, sales, and finance of the accused vacuum products, including design records, manufacturing records, sales records, marketing records, communications, and revenue information, are created and maintained in Needham. Flynn Decl. ¶¶ 35–36; Freese Decl. ¶¶ 5–8.

Many of these documents can only be accessed by personnel with the appropriate credentials, and none of these personnel are in Texas.  Flynn Decl. ¶ 34; Freese Decl. ¶ 7.  *See TikTok, Inc.*, 85 F.4th at 359.  SN Operating engineers in Needham work with Wayne Conrad and his colleagues to implement his inventions in SharkNinja vacuums; as such, documents, prototypes and product samples reflecting that work are maintained in Needham.  Freese Decl. ¶ 11.

Defendants are not aware of any relevant sources of proof located within this District. Freese Decl. ¶¶ 4, 7; Flynn Decl. ¶¶ 35–36.  No design work occurred in this District, or the State of Texas generally.  Freese Decl. ¶¶ 4, 7; Flynn Decl. ¶ 31.  Moreover, while the majority of evidence will center around the accused vacuum products, to the extent that Dyson has any relevant sources of proof, Dyson Inc.'s U.S. headquarters are located outside of the District—in Chicago, Illinois—and Dyson Technology Limited is located in the United Kingdom.  The covers of the asserted patents identify the named inventors as residing in Great Britain.  *See generally* AC, Exs. 1–5, 12–15.  When Dyson moved to transfer infringement claims brought by SN Operating, SN Sales, and the Omachron Defendants in Massachusetts, moreover, Dyson represented to the Massachusetts court that "[t]he location of Dyson's relevant U.S. documents" is Chicago.  Morgan Decl., Ex. 5 at 18.  Notably, Dyson omitted any reference to its U.K. headquarters and relevant persons located outside of the United States.  In the numerous filings and exchanges between the parties since this overall dispute began in 2023, neither party has identified anything of relevance in this District.

Given the overwhelming sources of proof in Needham, Massachusetts, compared to the lack of sources of proof located within this District, this factor weighs heavily in favor of transfer. *TikTok, Inc.*, 85 F.4th at 358 (finding this factor weighs in favor of transfer "where the current district lacks any evidence relating to the case"); *Samsung*, 2 F.4th at 1379 (finding the district

court assigned too little weight to the location where the relevant events and circumstances giving rise to the infringement claims occurred); *In re Acer Am. Corp.*, 626 F.3d 1252, 1256 (Fed. Cir. 2010), *as amended* (Jan. 13, 2011) (finding sources of proof factor weighed "significantly" in favor of transfer when the identified sources of proof were likely closer to the transferee forum and no party identified any source of proof in the transferor forum); *Wireless Recognition Techs. LLC v. A9.com, Inc.*, 2012 WL 506669, at *4 (E.D. Tex. Feb. 15, 2012) (finding "significantly greater amount of the sources of proof relevant to this lawsuit" in transferee forum).

### b) Relevant Non-Party Witnesses Are Located in Massachusetts.

"The convenience of the witnesses is probably the single most important factor in [a venue] transfer analysis." *In re Genentech, Inc.*, 566 F.3d 1338, 1342 (Fed. Cir. 2009) (quoting *Neil Bros. Ltd. v. World Wide Lines, Inc.*, 425 F. Supp. 2d 325, 329 (E.D.N.Y. 2006)). "Although the court must consider the convenience of both the party and non-party witnesses, it is the convenience of non-party witnesses ... that is the more important factor and is accorded greater weight in a transfer of venue analysis." *Wireless Recognition*, 2012 WL 506669, at *5. The Fifth Circuit applies the "100 mile" rule—"[w]hen the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *In re TS Tech USA Corp.*, 551 F.3d 1315, 1320 (Fed. Cir. 2008) (quoting *In re Volkswagen AG*, 371 F.3d 201, 204–05 (5th Cir. 2004) ("*Volkswagen I*")).

SharkNinja, Inc. is the only named SharkNinja defendant; it has no relevant employees. The relevant witnesses work for SN Operating or SN Sales and are non-party witnesses. Those non-party witnesses in or near Needham include: Larry Flynn, Neil Shah, Josh Scott, Adam Quigley, John Freese, Ross Richardson, Steve Gacin, Alex Calvino, Anthony Marra, Danielle Lessing, Julien Levesque, and Kerry Polmonari. Flynn Decl. ¶¶ 1, 36; Freese Decl. ¶¶ 2, 9.

In Dyson's infringement claims against the SharkNinja entities in Massachusetts, Dyson acknowledged SharkNinja's identification of numerous employees who "work on the design, engineering, sales, marketing, or finances related to SharkNinja vacuums out of SharkNinja's Needham headquarters." Morgan Decl., Ex. 3 ¶ 9. Recognizing the relevance of these witnesses, Dyson also recently noticed the depositions of a majority of these witnesses in that litigation.

For all of these witnesses, travel to Boston would be far more convenient than travel to Marshall, Texas. The burden associated with travel to a distant forum is an important consideration in the transfer analysis. *See TikTok, Inc.*, 85 F.4th at 361–62; *Volkswagen I*, 371 F.3d at 204–05; *Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*, 2015 WL 123852, at *6 (E.D. Tex. Jan. 7, 2015) (finding the additional travel time for employee-witnesses would be disruptive to the party's business). By having to travel to Texas to testify, these witnesses will be subject to increased travel burdens, longer absences from family and personal obligations, and longer absences from work than if the trial were held in the District of Massachusetts.

To the extent Mr. Conrad is asked to testify on behalf of the Omachron Defendants, the distance from Hampton, Ontario, Canada—the location of the Omachron headquarters—to Boston is 557 miles. In contrast, the distance from Hampton, Ontario to Marshall, Texas is 1363 miles.

As to potential witnesses from Dyson, Dyson Technology's headquarters in Malmesbury, United Kingdom is also significantly closer to the District of Massachusetts (about 3186 miles away) than it is to Marshall (about 4583 miles away). Dyson, Inc.'s headquarters in Chicago, Illinois is approximately equidistant to the District of Massachusetts (about 849 miles away) and Marshall (about 865 miles away). Similar to the location of documents, Dyson represented to the Massachusetts court that its "relevant U.S. witnesses are all based out of its Chicago office." Morgan Decl., Ex. 5 at 17–18. Dyson has nothing in or near Texas.

███████████

Defendants, moreover, are not aware of any relevant witnesses located in this District.  As explained, the accused products were not designed, developed, or manufactured in Texas, much less within this District.  ████████████████████████████████████ ████████ those employees are not involved in the design, development, or manufacturing of the accused products.  Flynn Decl. ¶¶ 39–41.  This factor thus weighs heavily in favor of transfer. *See Farmobile LLC v. Farmers Edge Inc.*, 2022 WL 2653893, at *4 (E.D. Tex. July 7, 2022); *In re Honeywell Int'l Inc.*, 2024 WL 302397, at *3 (Fed. Cir. Jan. 26, 2024); *Acer*, 626 F.3d at 1255.

### c)  Transferee District Has Subpoena Power Over Non-Party Witnesses.

"Transfer is favored when a transferee district has absolute subpoena power over a greater number of non-party witnesses [than the transferor district]."  *Adaptix, Inc. v. HTC Corp.*, 937 F. Supp. 2d 867, 874 (E.D. Tex. 2013); *see also In re Hoffman-La Roche, Inc.*, 587 F.3d 1333, 1337– 38 (Fed. Cir. 2009).  A district court's subpoena power extends to:  (1) a witness that lives or works within 100 miles of the courthouse, (2) a party or a party's officer that lives or works within the state, and (3) a non-party witness who similarly resides or works in the state so long as his or her attendance would not result in "substantial expense."  Fed. R. Civ. P. 45(c)(1)(A)–(B).

At least two witnesses would be subject to the absolute subpoena power of the District of Massachusetts.  Jess Schroeder, the former Senior Manager of Product Development for the Shark® brand, worked on some of the cordless vacuum products, including ███████████ ████████████████████████████████  Freese Decl. ¶ 10.  Jason Thorne, the former Head of Engineering for the Shark® brand, also worked on development of the accused vacuum products, including ███████████████████████████████████████ ███████████████  *Id.*  Both witnesses still live and work in the Boston area.  *Id.*  And because both are located in the Boston area and are non-parties, the Eastern District of Texas would have no subpoena power over them—absolute or compulsory.

Moreover, because the accused vacuum products were developed in the Boston area, it is likely that any other former employees of SN Operating who may be called to testify also reside near Boston. *See Kleiner v. Sw. Airlines Co.*, 2008 WL 4890590, at *4 (W.D. Tex. Nov. 4, 2008). Accordingly, this factor thus weighs in favor of transfer.

### d)  Pending Litigation in Massachusetts Strongly Favors Transfer.

"[T]he existence of multiple lawsuits involving the same issues is a paramount consideration when determining whether a transfer is in the interest of justice." *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009) ("*Volkswagen III*"). There is no question that transferring these claims to the District of Massachusetts would result in judicial efficiency, as Dyson itself has recognized. As explained above, the parties have asserted numerous patent infringement claims against one another in Massachusetts. On August 15, 2023, SN Operating, SN Sales, and the Omachron Defendants asserted that Dyson's stick vacuums infringe eight patents. Morgan Decl., Ex. 6. Eight months later, and two weeks before filing this case, Dyson sought to inject three of its patents into that case, asserting that many of the same SharkNinja vacuums accused in this case infringe the three patents. Morgan Decl., Ex. 3 at ¶¶ 812–864. On August 15, 2024, the Massachusetts court severed Dyson's counterclaims from the patent infringement allegations asserted by SN Operating, SN Sales, and the Omachron Defendants. Morgan Decl., Ex. 7. Unhappy with that decision, after the severance order and after the SharkNinja and Omachron parties accused of infringement answered and counter-counterclaimed (Morgan Decl., Ex. 8), Dyson amended its complaint here to add the three patents first asserted in Massachusetts. Given Dyson's infringement claims in Massachusetts against several of the same SharkNinja vacuums, the Massachusetts court will be familiar with the parties, accused products and relevant technology. Dyson has recognized the substantial overlap between the three Massachusetts patents and those originally asserted here. *See, e.g.*, Dkt. No. 27 at 2.

Dyson's case here is in its nascent stages—the initial case management conference has not yet occurred, and few judicial and party resources have been invested. Transfer to Massachusetts would not hinder progress of the case or prejudice Dyson. This factor strongly favors transfer. *Volkswagen III*, 566 F.3d at 1351.

### 4.    The Public Factors Also Weigh in Favor of Transfer.

#### a)  The District of Massachusetts Has a Strong Localized Interest.

The second factor—localized interests—strongly favors transfer. "This factor most notably regards not merely the parties' significant connections to each forum writ large, but rather the 'significant connections between a particular venue and *the events that gave rise to a suit*.'" *In re Apple Inc.*, 979 F.3d 1332, 1345 (Fed. Cir. 2020) (emphasis in original); *TikTok, Inc.*, 85 F.4th at 364 (finding this factor "weighs heavily in favor of transfer [when] … there is no relevant factual connection to the [transferor district]") (alterations in original). Here, not only is SN, Inc.'s principal executive office located in the District of Massachusetts, but also, the events that gave rise to this suit, that is, the research and development, product development, sales, finance, operations, and marketing for the accused vacuum products, all indisputably took place in Massachusetts. Flynn Decl. ¶¶ 31, 35–36; Freese Decl. ¶¶ 5–8. Moreover, as described above, the activities related to the accused vacuum cleaner products that Dyson relies on in its Complaint occurred in Massachusetts. AC ¶¶ 21–39. For these reasons, the District of Massachusetts has a greater localized interest in this suit. *See Farmobile*, 2022 WL 2653893, at *6 (greater localized interest where defendant's offices are located and accused products were developed); *Wireless Recognition*, 2012 WL 506669, at *6; *Honeywell*, 2024 WL 302397, at *2.

This District, on the other hand, has no compelling connection or public interest in having this controversy decided here. No party is a Texas corporation or has offices in Texas. Dyson is not registered to do business in Texas and has no registered agent in Texas. Morgan Decl. ¶ 11.

As in *Volkswagen I* and *II*, there is no relevant connection between the actions giving rise to this case and the District except that the accused products are sold in the venue just as they are sold throughout the United States.  These nationwide sales should be disregarded in favor of the other strong localized interests of Massachusetts.  *Wireless Recognition*, 2012 WL 506669, at *6 ("Interests that 'could apply virtually to any judicial district or division in the United States,' such as the nationwide sale of infringing products, are disregarded in favor of particularized local interests."); *see also Volkswagen II*, 545 F.3d at 318.  Defendants' presence in Massachusetts combined with Dyson's lack of presence in this District weighs in favor of transfer.  *See Farmobile*, 2022 WL 2653893, at *6 ("[W]here a movant has a local interest in the transferee venue and no presence in the transferor venue, this factor favors transfer."); *In re Samsung*, 2 F.4th at 1380; *Oyster Optics, LLC v. Coriant Am. Inc.*, 2017 WL 4225202, at *8 (E.D. Tex. Sept. 22, 2017).

### b)  The Other Factors Are Neutral.

The first, third, and fourth public interest factors are neutral.  Regarding the first factor, the Federal Circuit has held that "when other relevant factors weigh in favor of transfer or are neutral, 'then the speed of the transferee district court should not alone outweigh all of those other factors.'" *In re Google LLC*, 2021 WL 4427899, at *7 (Fed. Cir. Sept. 27, 2021).  Given that the districts are similarly equipped to handle patent infringement cases, and there are no concerns about conflicts of law or the application of foreign law, these factors are neutral.

On balance, all four private factors and one public factor strongly favor transfer, and the rest of the public factors are neutral.  This Court should thus transfer this case to the District of Massachusetts pursuant to Section 1404(a).

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the claims against them, or alternatively, transfer the claims to the District of Massachusetts.

Dated:  September 3, 2024

By:  /s/ Mark N. Reiter

Mark N. Reiter (TX Bar No. 16759900)
Nathan R. Curtis (TX Bar No. 24078390)
Ashbey N. Morgan (TX Bar No. 24106339)
mreiter@gibsondunn.com
ncurtis@gibsondunn.com
anmorgan@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone:  214.698.3112
Facsimile:  214.571.2910

Brian A. Rosenthal (NY Bar No. 3961380)
brosenthal@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York City, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Brian M. Buroker (DC Bar No. 457158)
bburoker@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, DC 20036
Telephone:  202.777.9413
Facsimile:  202.831.6063

Andrea L. Fair (TX Bar No. 24078488)
andrea@wsfirm.com
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Pkwy
Longview, TX 75604
Telephone:  903.757.6400

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, the foregoing was filed electronically in compliance with Local Rule CV-5(a) and served via electronic mail on all counsel of record who have consented to electronic service.

*/s/ Mark N. Reiter* _____ ____
Mark N. Reiter

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(h), the undersigned hereby certifies that counsel for Defendants has discussed with counsel for Plaintiffs the relief requested pursuant to 28 U.S.C. § 1404. Counsel for Plaintiffs has advised that it does oppose the requested relief.

*/s/ Mark N. Reiter* _____
Mark N. Reiter